IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

|  |  |
|---|---|
| JAMES M. TRAINOR, | ) ) 1:20-CV-00225-RAL ) |
| Plaintiff | ) ) RICHARD A. LANZILLO ) Chief United States Magistrate Judge |
| vs. | ) ) |
| WELLPATH, CORRECT CARE SOLUTIONS, CRNP SUTHERLAND, RNS FERDARKO, RNS PRINKEY, CNRP LESLIE, CHCA SMITH, LAMOREAUX, CRNP ROGERS, CRNP HARTZELL, U.M. BEST, C. HAYS, DR. MAXA, | ) MEMORANDUM OPINION ON ) DEFENDANTS' MOTIONS FOR ) SUMMARY JUDGMENT ) ) ECF NOS. 56, 68 ) ) |
| Defendants | ) ) ) ) |

Two motions for summary judgment are pending before the Court. The first was filed on behalf of Defendants Wellpath, L.L.C., formerly known as Correct Care Solutions ("Wellpath"), and four Wellpath employees: Health Services Administrator ("HSA") Lamoreaux, Certified Registered Nurse Practitioner ("CRNP") Leslie, CRNP Sutherland, and Dr. Maxa (collectively, "Medical Defendants"). ECF No. 56. The second was filed on behalf of three employees of the Pennsylvania Department of Corrections ("DOC"): CRNP Hartzell, CRNP Rogers, and Hays (collectively, "DOC Defendants"). ECF No. 68. Both motions will be granted.[1]

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636. *See* ECF Nos. 6, 18.

I.      **Introduction and Procedural History**

Plaintiff James M. Trainor, an inmate in the custody of the DOC at its Forest County

State Correctional Institution ("SCI-Forest"), asserted a federal constitutional claim and two state

law claims against several employees of the DOC, including the three DOC Defendants, and the

Medical Defendants based on allegations that they failed to provide him with necessary and

appropriate medical care.  ECF No. 1.  Count I of the Complaint is an Eighth Amendment claim

pursuant to 42 U.S.C. § 1983, Count II is a medical malpractice-negligence claim under

Pennsylvania law, and Count III is an intentional and negligent infliction of emotional distress

claim under Pennsylvania law.[2]  *Id.*, ¶¶ 9, 121–23.

The Medical Defendants answered Trainor's complaint (ECF No. 22).  The DOC

employee defendants moved to dismiss the claims against them pursuant to Fed. R. Civ. P.

12(b)(6).  ECF Nos. 25, 26.  The Court granted the motion in part and dismissed Count I against

all DOC employee defendants except the DOC Defendants, Hartzell, Rogers, and Hays.  The

Court also dismissed Counts II and III against all DOC employee defendants.[3]  ECF Nos. 34, 35,

36.  Thereafter, the three remaining DOC Defendants answered the surviving claims of the

Complaint.  ECF No. 38.

---

[2] The Court has primary subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Davis's state-law claims under 28 U.S.C. § 1337.

[3] The DOC employee defendants named in the complaint were Registered Nurse ("RNS") Ferdarko, RNS Prinkey, Chief Health Care Administrator Smith ("CHCA"), CRNP Rogers, CRNP Hartzell, Unit Manager ("UM") Best, and Activities Manager Hays.  The Court's Order the Rule 12(b)(6) motion dismissed with prejudice all claims against CHCA Smith, RNS Prinkey, and UM Best, Trainor's state law medical negligence claim (Count II) against Hays, and Trainor's intentional and negligent infliction of emotional distress claim (Count III) against all DOC employee defendants.  The Court's Order dismissed Trainor's Eighth Amendment claim (Count I) against Ferdarko and state law medical negligence claim (Count II) against Ferdarko, Rogers, and Hartzell without prejudice and with leave for Trainor to file an amended complaint.  ECF Nos. 35.  After Trainor failed to file an amended complaint within the time allotted to do so, the Court dismissed the latter claims with prejudice.  ECF No. 36.

After the close of discovery, the Medical Defendants filed their pending motion for summary judgment (ECF No. 56), along with a brief (ECF No. 57), concise statement of material facts (ECF No. 58), and medical records from February 2017 to May 2022 (ECF No. 57-1). Thereafter, the DOC Defendants filed their pending motion for summary judgment (ECF No. 68), supporting brief (ECF No. 69), concise statement of material facts (ECF No. 70), and appendix consisting of the following five exhibits: DC-ADM 804 Policy & Procedures Manual (Inmate Grievance System) (ECF No. 71-1, pp. 2-37), Declaration of Michael "Skip" Bell (*id.*, pp. 38-41), Declaration of Lisa Reeher (*id.*, pp. 44-45), Grievance Listing for Trainor, James McDonald MT2872 (*id.*, pp. 47-51), and Inmate Grievance No. 819790 (*id.*, pp. 53-61).

Trainor filed a single brief and fifteen exhibits in opposition to both motions. ECF No. 73.[4] Pursuant to Local Rule 56(C), Trainor also filed a concise statement of material facts responding to the Medical Defendants' concise statement (ECF No. 75) and a concise statement of material facts responding to DOC Defendants' concise statement (ECF No. 76). Trainor also included with his responsive filings a motion to withdraw his intentional and negligent infliction of emotional distress claim (Count III) against all Defendants. ECF No. 73-15. Based on that motion, the Court deems Count III abandoned and will be dismissed as against all Defendants. This leaves Trainor's Eighth Amendment claim alleging deliberate indifference to serious

---

[4] Appended to his brief were the following relevant exhibits: 10.19.17 Findings and Recommendations of Dr. Maxa (Ex. A, ECF No. 73-1, pp. 2-3), 11.24.17 Inmate's Request to Staff Member CRNP Marlowe (Ex. B, ECF No. 73-2), 11.28.17 Inmate's Request to Staff Member Hays (Ex. C, ECF No. 73-3), 11.16.17 Inmate's Request to Staff Member Hays (Ex. D, ECF No. 73-4), 01.04.18 Findings and Recommendations of Dr. Maxa (Ex. E., ECF No. 73-5), 12.28.17 Inmate's Request to Staff Member Overmeyer (Ex. F, ECF No. 73-6), 03.03.19 Inmate Request to Staff Member Dr. Maxa (Ex. G, ECF No. 73-7), List of Medical Grievances Submitted and Initial Review Response for Grievance # 798016 (Ex. H, ECF No. 73-8, pp. 2-3), 08.01.19 Inmate Request to Staff Member Oberlander (Ex. I, ECF No. 73-9), 11.21.19 Inmate Request to Staff Member Gustafson (Ex. J, ECF No. 73-10), 03.02.18 Inmate Request to Staff Member Best (Ex. K, ECF No. 73-11), 10.29.22 Unsworn Declaration of James Trainor (Ex. L, ECF No. 73-12, pp. 2-4), and 04.03.19 Medical Record of Radiologist Dr. Logan (Ex. M, ECF No. 73-13). Trainor also attached his DOC Defendants responsive concise statement and Medical Defendants responsive concise statement (Ex. N, ECF No. 73-14, pp. 2-10), which were re-docketed at ECF Nos. 75 and 76, respectively, and a motion to dismiss Count III against all Defendants (Ex. N, ECF No. 73-15), which will be addressed *infra*.

medical needs (Count I) against all Defendants and his medical malpractice/negligence claim
(Count II) against Medical Defendants.

## II.     Material Facts

The material facts are derived from Trainor's verified complaint and the exhibits attached
thereto,[5] Medical Defendants' concise state of material facts and appended exhibits, DOC
Defendants' concise statement of material facts and appended exhibits, and Trainor's responsive
concise statements and appended exhibits.   Disputed facts are noted.

According to his verified complaint, Trainor sustained a thoracic spinal cord injury in
2006 that left him paralyzed for over eight years.  Prior to his incarceration, he underwent spinal
surgery and three leg surgeries.  ECF No. 1, ¶¶ 12, 15.  He also avers that "[he] suffered injuries
such as heart valve damage, atrophy (cartilage and tissue death in legs), edema (poor
circulation), severe nerve damage, muscle spasms, neck, head, and back trauma, and leg
swelling;" and "developed flalic and paralic tissue within his legs."  ECF No. 1, ¶¶ 16, 20.

Trainor was arrested in January 2016 and initially placed at the Beaver County Prison.
While there, "he was permitted double trays and a double mattress for his medical condition"
because he needed "3700 calories a day" to "maintain his muscle mass and lower extremity
strength." *Id.*, ¶¶ 26, 25.  Trainor was transferred to SCI-Forest in January 2017 and issued a

---

[5] The exhibits included with Trainor's complaint are a 01.24.2019 letter from Dr. Florian (ECF No. 1-1), 03.30.2016
letter from Dr. Florian (ECF No. 1-2), 01.26.2016 order for extra mattress at Beaver County Prison (ECF No. 1-3),
02.15.2017 receipt for permanent walker (ECF No. 1-4), 10.14.2017 Inmate's Request to Staff Member Smith (ECF
No. 1-5), 10.15.2017 Inmate's Request to Staff Member Smith (ECF No. 1-6), 10.16.2017 Inmate's Request to Staff
Member "The Activity Department Hays/Howard/Hummel/Fiscus/Corter/Gibby" (ECF No. 1-7), 11.24.17 Inmate's
Request to Staff Member CRNP Marlowe (Ex. B, ECF No. 73-2), 11.16.17 Inmate's Request to Staff Member Hays
(ECF No. 1-8), 12.28.17 Inmate's Request to Staff Member Overmeyer (ECF No. 1-9), 03.02.2018 Inmate's
Request to Staff Member Best (ECF No. 1-10), 05.09.2018 Inmate's Request to Staff Member Fedarko (ECF No. 1-
11), 05.14.2018 Inmate's Request to Staff Member Fedarko (ECF No. 1-12), 2018 receipt for a permanent walker
(day and month illegible) (ECF NO. 1-13), Initial Review Response for Grievance No. 795693 (ECF No. 1-14),
04.10.2019 Inmate's Request to Staff Member "UM Best /  Sgt Hogue / Sgt Albertine" (ECF No. 1-15, p. 1), and
08.01.2019 Inmate's Request to Staff Member Warden Oberlander (ECF No. 1-15, p. 3).

4

walker with wheels on February 15, 2017.  After declining physical therapy ("PT") on March 23,

2017, he had his first PT appointment at SCI-Forest on October 19, 2017.  At this appointment,

Trainor told physical therapist Eugene Zappa that he "had been shot in the back in 2000, had a

bilateral total left knee replacement in 2012, a total right knee replacement in 2013, and only

used his walker 3 times since June of 2017." ECF No. 58, ¶ 11.  After assessing that Trainor had

"chronic back and lower extremity pain," Zappa instructed him to "surrender his walker," while

noting that if he needed it again his block could call down to medical.  He also advised Trainor

"to use the lower extremity strengthening gym equipment and continue his use of the stationary

bike and elliptical unit." *Id.*  Zappa additionally "issued Mr. Trainor a low back stretching [sic]

and lower extremity and strengthening exercises." *Id.*  Dr. Maxa reviewed and approved

Zappa's assessment and plan that same day.

Trainor next saw Zappa on November 8, 2017.  Trainor informed him "that he was able

to complete his home exercise program in his cell," but "complained that he [wa]s unable to

attend gym sessions because it conflict[ed] with the med line." *Id.*, ¶ 13.  Zappa assessed Trainor

and noted that "[h]e continued to ambulate without a walker, appeared to have good tolerance

and balance, his knees had functional ROM [range of motion] and strength.  He continued to

demonstrate edema in his lower extremities from knee to foot." *Id.*  In his appointment notes,

Zappa detailed the plan for Trainor as follows: "continue with present exercise program.  If

possible – to adjust meds so that he can skip AM med line to attend gym classes." ECF No. 57-

1, p. 58.

On December 5, 2017, Trainor saw Defendant CRNP Leslie.  At this appointment, he

asked that "his activities permissions be raised to 5 days per week, and wanted to use a

handicapped shower." *Id.*, ¶ 14.  Leslie said he would discuss his requests with medical, and

noted that "he did not exhibit signs of acute distress and ambulated into the office." *Id.* By December, Trainor's gym and medication line scheduling conflict had been resolved.

Trainor was seen by Defendant CRNP Sutherland on December 8, 14, and 29, 2017.  The first two appointments were for a urinary tract infection and sore throat, respectively.  On December 29, Sutherland addressed the five sick calls Trainor had filed that "week, requesting use of the handicapped shower and dining pass, return of his walker, to see the physical therapist, his Neurontin dose increased, a refill of his hydrocortisone 2.5% cream, and to be allowed to go to the gym 5 times per week." *Id.*, 18.  After assessing Trainor, Sutherland concluded that "he was walking well without a walker," and so could not mandate use of a handicapped shower or dining pass and would not re-issue his walker. *Id.*  Sutherland also noted that "his then-current Neurontin dosage appeared to be effective and, absent a new finding with PT, they would keep it at the current level." *Id.*  Lastly, Sutherland "informed Mr. Trainor that he had no power over the gym schedules." *Id.*

On January 4, 2017, Trainor had a medical appointment with Sutherland and PT with Zappa.  At his medical appointment, he again asked for the return of his walker, use of a handicapped shower, an early meal pass, and increased gym access.  In his notes, Sutherland recorded that Trainor would see Zappa immediately following the appointment and that Zappa could determine whether the walker would be reissued.  Additionally, he memorialized that "Trainor did not exhibit a need for early meal passes nor a handicapped shower stall," though he told Trainor he could discuss the shower request with his unit manager. *Id.*, ¶ 19.  He added that "Trainor's request for increased use of the gym had been discussed on multiple occasions and that Mr. Trainor was to adhere to the rules of the facility regarding his request for an increased use of gym." *Id.*

At his subsequent PT appointment, "Trainor continued to complain of lower back and bilateral knee discomfort." *Id.*, ¶ 30. Zappa noted that Trainor also "stated he had not been to the gym since September 2017," and asked for "his walker back" because "he felt unsafe when walking on snowy and icy surfaces," as well as for "access to a handicapped shower" because "he had difficulty getting off the shower bench." *Id.* Zappa examined Trainor and concluded that he had leg strength, a good ROM, no visible leg spasms, "could ambulate without the use of assistive devices, and walked with a slow but steady pace with good balance tolerance." *Id.* Zappa put Trainor "on a 3-5 times per week gym program in which he was to use a stationary bike, treadmill, quad, hamstring strengthening, and leg press," and he reissued him a walker for "use outside through the winter months when walking in snowy or icy conditions," but "to be discontinued April 1, 2018." *Id.*

Trainor was seen by Sutherland on January 8, 11, and 30, 2018 for related reasons. On January 8, Sutherland reissued a walker, and, at Trainor's request, applied for an increased dosage of Neurontin. At this time, Trainor's medication regimen included Baclofen. Sutherland next saw Trainor for a sick call and noted that he did not appear to be in acute distress and was walking without a walker. Additionally, Sutherland recorded that a med line nurse had discussed the change in med line time with Trainor the day before (January 10, 2018). And on January 30, Sutherland replaced Trainor's TED hose, which Sutherland had first issued him on January 4, 2018.[6]

In Sutherland's March 2, 2018 notes, he referred to a sick call Trainor had submitted asking for a double mattress, noting that "[h]e advised Mr. Trainor that medical did not provide [sic] double mattress." *Id.*, ¶ 27; ECF No. 57-1, p. 387. On March 13, 2018, a day after Trainor

---

[6] The records and filings do not state when Trainor was first issued TED Hose, but Zappa's January 4, 2018 PT record includes a reference to them.

was placed in the RHU, he did not show up for a sick call appointment with Sutherland. He did present for a sick call appointment with Sutherland on March 29, and complained of his inability to walk in the yard without a walker. Sutherland recorded that he was having "gait difficulty" and had a history of such difficulty. ECF No. 57-1, p. 383. Sutherland wrote that he alerted Lt. Cochran to Trainor's concerns, and that Cochran would "attempt to address" them. *Id.*

On April 2, 16, and 20, 2018, Sutherland saw Trainor for back and leg concerns, and April 4 and 5 for bladder concerns. At his first appointment, "Trainor was complaining of chronic back pain and requesting pain relievers." ECF No. 57, ¶ 31. Sutherland noted that Trainor was walking with a stoop and prescribed him "Tylenol 375 mg to be taken three times per day on an as needed basis for his pain." On April 11, Sutherland ordered that Trainor's medication be dispensed in crushed form after "Trainor had been caught hoarding Tylenol during a routine cell search in the RHU." *Id.*, ¶ 34. Sutherland also discontinued his Tylenol prescription and referred him for a psych evaluation. Sutherland explained this to Trainor at the appointment on April 16, and reinstated Trainor's Tylenol order for 650 mg t.i.d. prn on April 20. The Medical Defendants assert that, on April 30, Leslie attempted to see Trainor in response to a sick call but left after knocking three times without a response. Trainor disputes that Leslie tried to see him that day.

Trainor was next seen for leg and back issues on May 4, 2018. After Sutherland examined him, he reissued a walker, although he noted that Trainor "did not appear to be in acute distress." ECF No. 57, ¶ 39. Sutherland also adjusted Trainor's medication times. Sutherland saw Trainor again on May 7 for a routine Chronic Care Clinic ("CCC") appointment and on the following day in response to

> multiple requests - a double mattress, a stationary bike, an increase
> in his pain medications, and to discuss his bloodwork and

8

cardiomyopathy, which his PCP reportedly discussed with him in 2015. During his examination, Mr. Sutherland reviewed Mr. Trainor's 1/24/2017 X-ray and advised Mr. Trainor that it showed cardiomyopathy. Per the plan, he advised Mr. Trainor that medical is unable to approve Mr. Trainor's request for a double mattress and noted that Mr. Trainor was on cell restriction so he would discuss his request for a stationary bike with security. Mr. Sutherland further advised that Mr. Trainor was already taking Neurontin 600 mg so no changes were needed for his pain medication, he had no current blood work to discuss but bloodwork would be ordered for his next CC, and he would order him an echocardiogram for his cardiomyopathy demonstrated on his chest X-ray.

*Id.*, ¶ 42.

On May 10, 2018, Trainor received an echocardiogram after Dr. Maxa reviewed and approved Sutherland's request. And eight days later, radiologist Dr. Lohan examined the echocardiogram and found the results to be relatively unconcerning.[7]

Sutherland saw Trainor again on July 10, 22, and 24, 2018. At the first of these appointments, Trainor complained of respiratory issues and requested orthotics and hydrocortisone. Sutherland examined Trainor and memorialized, *inter alia*, that his legs exhibited no signs of swelling, poor circulation or blood oxygenation, or disease.[8] Sutherland "prescribed Mucinex 400 mg and hydrocortisone 2.5%, issued him insoles," placed him "on a non-contact sports restriction and recommended" him "for ground level housing and lower bunk status due to his history of paralysis." *Id.*, ¶ 46. On July 22, Sutherland examined Trainor for bladder concerns. Shortly after, Trainor was placed in the RHU, which is where Sutherland saw him two days later. At this appointment, Trainor "request[ed] a better mattress and pillow. Upon

---

[7] Dr. Lohan's conclusion was: "grossly preserved left ventricular function with no comment possible on diastolic function, no significant valvular heart disease, and possible mild aortic root dilatation." ECF No. 57-1, pp. 55-6.

[8] "[H]e had no edema, cyanosis, or clubbing of extremities."

examination, Mr. Sutherland noted that Mr. Trainor did not appear to be in any acute distress but ambulated slowly.  Mr. Sutherland advised that the items were not medically necessary." *Id.*, ¶ 49.

In August 2018, Sutherland examined Trainor on three occasions.  On August 6, Sutherland recorded that Trainor was "again in RHU" and "request[ed] his shoes due to gait dysfunction."  ECF No. 57-1, p. 337.  Sutherland examined Trainor and noted that he had an "abnormal gait," and "tremor/spasms," as well as chronic pain.  *Id.*  For the plan, Sutherland wrote that he forwarded Trainor's request to the PRC.  Trainor disputes that Sutherland forwarded his request.  On August 23, Sutherland examined Trainor at his routine CCC appointment.  Sutherland recorded Trainor's vitals, which were normal, and started him on an asthma medication because of his history of severe asthma.  At Trainor's last appointment for the month, he "request[ed] an increase in Neurontin and orthotic shoes.  Mr. Sutherland noted that Mr. Trainor was already on Cymbalta and Neurontin for pain relief, he was unable to increase Mr. Trainor's Neurontin, and there was no indication for orthotic shoes."  In fact, according to Leslie's medical notes following a well-visit with Trainor on September 24, 2018, Trainor's Neurontin had already been increased on August 3.  As such, Leslie denied Trainor's request to increase his Neurontin dosage on September 24, determining after an assessment that the recent increase was sufficient.

Sutherland examined Trainor again on October 30 and November 1, 2018.  At the earlier appointment, Sutherland noted that Trainor may have had a tooth infection and so prescribed him penicillin and referred him to dental.  The later appointment was his routine hypertension, cardiac, and pulmonary CCC visit.  Sutherland recorded his vitals, diagnosed him with atherosclerotic cardiovascular disease (ASCVD), determined his hypertension had "worsened but

was still fair," and his asthma was sufficiently controlled.  ECF No. 57, ¶ 57.   Sutherland

changed Trainor's medication to better suit his ASCVD diagnosis and scheduled him for a six-

month follow-up.  On November 29, 2018,

> Sutherland performed a Preventative Health Risk Assessment Tool
> regarding Mr. Trainor. Per the tool, it was noted that Mr. Trainor
> was a 55-year-old man that is 6'2", weighed 234 lbs., and had a
> BMI of 30, blood pressure of 130/90, and a pulse of 72. It was
> further noted that Mr. Trainor had an existing cardiovascular
> disease and received an annual fasting lipid profile, high LDL
> calculated, etc. (Exh. A, pp. 296-9) He ordered him 3 hemoccult
> lab test for his annual colon cancer risk assessment. (Exh. A, pp.
> 300-1). In addition, Mr. Sutherland also completed a Use of Force
> Clearance/Contraindications Form, advising that Mr. Trainor had
> ischemic cardiomyopathy that was an absolute contraindication for
> the use of OC spray and clearing him for EBID Use of Force only.

*Id.*, ¶ 60.  Sutherland then issued Trainor a walker for use until April 2019.  However, the walker

was confiscated on December 7, 2018, after "Trainer had been videoed in the yard doing leg

presses and ambulating without a walker."  *Id.*, 62.

In RN McGill's February 19, 2019, progress notes, he memorialized that he "observed

Mr. Trainor walking without difficulty" or "assistive devices" in "an upright position" and with

"a mild left leg limp."  ECF Nos. 57, ¶ 71; 57-1, p. 263.  McGill noted that Trainor's "strides

[we]re normal gap for his height," and that "[h]e stop[ped] at least twice and perform[e]d

motions of turning at waist to greet peers as" he "advance[d] to" the "med room."  *Id.*

Additionally, McGill wrote that "[Trainor] display[ed] no appreciable instability, weakness or

decreased rotation . . . other than the aforementioned mild limp."  *Id.*

Sutherland saw Trainor again on March 2, 2019, to assess his "tremors/spasms, atopic

dermatitis intrinsic eczema, mild intermittent asthma, benign hypertension, localized edema,

chronic pain, and ischemic cardiomyopathy."  ECF No. 57, ¶ 72.  Sutherland renewed Trainor's

prescriptions: "Acetaminophen, Alvesco inhaler, Baclofen, Duloxetine, Gabapentin, Hydrocortisone ointment, Potassium CL, and his Xopenex inhaler." *Id.* Medical also ordered Trainor a new pair of glasses. The next day, Sutherland issued Trainor a replacement pair of TED Hose after assessing the swelling in his lower extremities.

A month later, Sutherland saw Trainor in response to his complaints of a cough, body aches, and urinary concerns. Sutherland diagnosed him with bronchitis, ordered a chest x-ray, and prescribed him "Azithromycin 250mg, Guaifenesin 400mg, and Prednisone 20mg." *Id.*, ¶ 75. The x-ray showed "no evidence of acute cardiopulmonary disease." *Id.*, ¶ 76. On April 24, 2019, Sutherland reviewed Trainor's lab work and noted that he had "high LDL and cholesterol, and needed to be put on statin." *Id.*, ¶ 77. Sutherland saw Trainor for a follow-up appointment the next day and started him on "Lipitor 20 mg for his hypercholesterolemia." *Id.*, ¶ 78.

Leslie saw Trainor at his cell in the RHU on May 2, 2019, and Sutherland saw him on May 10. Leslie's visit was in response to his sick call "requesting a double mattress, an extra blanket, and physical therapy equipment in his RHU cell." *Id.*, ¶ 79. Leslie informed Trainor "that they do not issue extra mattresses, extra blankets, nor PT equipment, especially in the RHU," and noted that he did not appear to be in acute distress. *Id.* When Sutherland saw Trainor a week later, Trainor requested that his Tylenol not be crushed. Sutherland memorialized that he could not change the crush order because Trainor had been "caught hording Tylenol in" the RHU. *Id.*, ¶ 80. According to Leslie, he again "attempted to see Mr. Trainor on a sick call visit in the RHU" on May 21, but left after Trainor failed to respond to his knocks. *Id.*, ¶ 81. Trainor disputes that Leslie attempted to see him.

Sutherland saw Trainor on July 1, 3, 12, and 16, 2019. At the first appointment, Trainor requested his walker back. Sutherland refused, noting that "he observed Mr. Trainor walking

across the yard without significant difficulty." *Id.*, ¶ 82.  He requested his walker back again at the second appointment, as well as TED hose replacements.  After assessing his gait, edema, and cardiomyopathy, Sutherland replaced his TED hose but again denied the reissuance of a walker because "assistance was not medically necessary due to his current gait." *Id.*, ¶ 83.  On July 12, Sutherland examined Trainor in response to complaints of breathing difficulty and dizziness. Sutherland noted that Trainor "did not appear to be in acute distress and he was ambulatory." *Id.*, ¶ 84.  On July 16, Sutherland examined Trainor in response to his request for ACE wraps for his leg spasms.  Sutherland note that he discussed this request with "Dr. Maxa and the CHCA and it was determined that the ACE wraps were not necessary and posed a safety risk while Mr. Trainor was in the RHU." *Id.*, ¶ 85.

On July 30, 2019, RN Smith reviewed Trainor's chart after he had written to the "dietary supervisor stating he was losing weight and needed a supplement/ snack bag." *Id.*, ¶ 86.  In her administrative note, Smith wrote:

> Similar requests answered by medical staff- he does not meet criteria and it is not medically indicated. His last vists [sic] were on 7-16-19 and 7-12-19 and he made no complaint of weight loss. His last weight was less than a month ago on 7-3-19 at 238.5. At 6'2" his BMI is overweight and does not indicate he needs any type of nutritional supplement. Dietary supervisor to respond to his request and refer inmate Trainor back to the sick call process.

ECF No. 57-1, p. 200.  Trainor denies this "to the extent that the medical records accurately reflects [sic] Mr. Trainor's weight loss during this time." ECF No. 75, ¶ 86.

Sutherland assessed Trainor for a wellness check on August 5, 2019, and noted that his BMI was 30.55.  Trainor requested extra protein at this appointment but Sutherland "made no further orders regarding his diet." ECF No. 57, ¶ 87.

According to Trainor's verified complaint, he injured his left foot while attempting to stand up from his bed on August 14, 2019. *See* ECF Nos. 1, ¶ 89. Trainor avers that "[d]uring evening med-pass," he told Defendant "Hartzell that he had broken his foot;" and in response, Hartzell said: "looks bad, I'll contact triage." *Id.* ¶ 90. Shortly after, he submitted a sick call complaining that he had broken his foot. Trainor further asserts that he "repeatedly reported his broken foot during med-pass," and that Defendant CRNP "Rogers repeatedly informed [him] during med-pass that 'it looks bad, triage was notified.'" *Id.*, ¶ 92.

According to Leslie's August 19, 2019 Progress Note, he "knocked on" Trainor's RHU cell "door on 2 occasions during rounds" but "[Trainor] remained sleeping." ECF No. 57-1, p. 193. Leslie noted that "[h]e may place a sick call if he wishes to be seen." *Id.* Trainor disputes that Leslie came to see him that day.

In a Progress Note submitted by Defendant Rogers on August 29, 2019, she noted that "[Trainor] state[d] he ha[d] not been seen yet for his foot and it ha[d] healed but he believe[d] it 'healed wrong.'" *Id.*, ¶ 192.

Sutherland examined Trainor on September 4, 2019, during which Trainor complained of "increased leg spasms." ECF No. 57, ¶ 89. Sutherland assessed him and concluded he was not in acute distress; however, he issued him an additional Baclofen prescription to help reduce the spasms and associated pain. According to Trainor, he also told Sutherland about his broken foot at this appointment and "Sutherland claimed he would have him seen by medical." ECF No. 1, ¶ 94. Trainor avers that he later submitted a third sick call request about his left foot.

On September 16, 2019, Sutherland saw Trainor to examine his left foot. "At that time, Mr. Trainor complained that he injured his left foot 1 month ago while getting out of bed," and that his foot was swollen and hurt. ECF No. 57, ¶ 90. After assessing his left foot, Sutherland

ordered an x-ray. Trainor underwent an x-ray the next day; it showed a fracture in his second toe

(second metatarsal bone) on his left foot. Sutherland then "ordered that he be issued a

wheelchair, and planned a referral to an orthopedic specialist." *Id.*, ¶ 92. Dr. Maxa also

reviewed the x-ray, and entered a note stating that Trainor had

> sustained his second metatarsal fracture is [sic] approximately 1-
> month ago and had been walking on his foot. He noted that the X-
> ray also showed significant callus formation around a mildly
> displaced fracture of the distal and 1/3 of the second metatarsal
> and, at that time, it appeared the fracture would heal without any
> surgical intervention and the CRNP placed him in a wheelchair for
> traveling long distances. They would plan to repeat the X-ray in a
> month to verify continued healing, and Mr. Sutherland would
> relate this plan to Mr. Trainor.

*Id.*, ¶ 93. On September 19, Sutherland relayed this information to Trainor, ordered a follow-up

x-ray for the next month, and renewed his medication. On October 17, 2018, Trainor's foot was

again x-rayed. "Per the impression, the X-ray showed stable healing fracture of the second

metatarsal diaphysis with stable alignment and a fracture line present" (*i.e.*, his toe was healing).

*Id.*, ¶ 98.

On October 22, Defendant R.N. Prinkey informed HSA Lamoreaux that "Trainor's

wheelchair had been returned to medical due to his complaints that it was broken." *Id.*, 97.

Prinkey

> also spoke with Dr. Maxa to determine if an order for a new
> wheelchair was indicated. Thereafter, he received an order for a
> left walking boot for Mr. Trainor to use them for 2 months and a
> wheeled walker for Mr. Trainor to use for 2 weeks as treatment for
> his complaints of weakness in his left leg since he came out of the
> RHU and he needed to increase strength in walking.

*Id.* Upon issuing these items to Trainor, Prinkey advised him "that the walker was to only be used for walking and not to sit on while being pushed." *Id.* Sutherland evaluated Trainor at his routine CCC appointment later that month. His vitals were unconcerning.

On November 6, 2019, Leslie arrived at Trainor's RHU cell for a sick-call visit. Trainor told Leslie that he believed he had "broke[n] his right foot when he fell out of the bed the other day," and "request[ed] a roller walker to remain with him at all time." *Id.*, ¶ 100. Examining him through the cell door, Leslie noted that Trainor "was lying in bed when he arrived at the door but was able to get out of bed and come to his cell door by holding onto the desk, shelves, etc." *Id.* Leslie observed that a toe on Trainor's right foot appeared abnormal and ordered an x-ray. He denied Trainor's request for a wheelchair in his cell and advised him that he could "continue to use his in-cell structures for ambulatory assistance." *Id.*

Trainor's right and left feet were x-rayed the next day. The x-ray of his left foot revealed continued healing. The x-ray of his right foot indicated a potential stress injury on his third toe. *Id.*, ¶ 101.

Trainor was examined on two additional occasions before he was released from the RHU on December 26, 2019. On December 10, Sutherland saw him and recorded that Trainor requested replacement TED hose and a walker because he had "experience[ed] trouble ambulating since being locked up in RHU." *Id.*, ¶ 102. Sutherland observed that Trainor struggled to walk and sent a request "to the nursing supervisor to contact the PRC" about Trainor's walker request. *Id.* Sutherland noted that he also recommended that Trainor receive a walker at that time. On December 23, physician's assistant Testa conducted a sick call examination. At the appointment, Trainor "request[ed] a wheelchair for worsening leg weakness." *Id.*, ¶ 103. After examining him from the cell door, Testa observed

> that he did not appear to be in acute distress, was able to ambulate
> from the bed to the door with assistance from pieces of furniture in
> his cell, and was able to stand at the door and speak with her for
> several minutes without any instability or significant fatigue.

*Id.* She then "informed [him] that she did not feel a wheelchair was medically necessary at that time, and observed that having a wheelchair would only exacerbate the disuse of his leg muscles which he was concerned about." *Id.* Testa instructed him to use the seat in the 4-wheeled walker ("rollator") when needed and issued him a new pair of TED hose.

Trainor did not appear for his next medical appointment on January 14, 2020. On January 20, "Trainor was caught trying to divert his crushed medications with a spit bottle." *Id.*, ¶¶ 105, 106. Sutherland saw Trainor on January 23, and recorded that Trainor "request[ed] a medication increase, and asserted that he was trying to save his medications for the next morning." *Id.*, ¶ 107. Sutherland told him that his Baclofen would not be increased at that time and he would be tapered off Neurontin because of his attempts to divert his medication. Trainor refutes that he "admit[ted] to diverting his meds" at that appointment. ECF No. 75, ¶ 107. Sutherland saw him again on January 27 and gave him a new pair of TED Hose.

Sutherland next saw Trainor on February 5 and 14, 2020. On February 5, he diagnosed Trainor with bronchitis and asthma, and proscribed him medication for each issue. On the 14th, Trainor complained of increased back spasms, and Sutherland observed that he hunched over when walking. He "prescribed Mr. Trainor a 2-week dose of Baclofen to be taken in addition to his current dose and a 1-month dose of" another pain medication (Diclofenac). *Id.*, ¶ 110.

On March 6, 2020, Testa saw Trainor and renewed his prescription for a different pain medication (Voltaren) for another ninety days. Four days later, Sutherland saw Trainor in response to his complaints of chronic pain and request for narcotics. Sutherland denied his request for narcotics because of Trainor's history of allegedly diverting his medication. He also

noted that Trainor was walking with a walker and did not exhibit acute distress.  According to

the record, Trainor did not complain about his back, legs, or related health issues again until

September 25, 2020, over a month after he initiated this civil action.[9]

## III.   Standard of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under this standard "the mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A

disputed fact is "material" if proof of its existence or nonexistence would affect the outcome

under applicable substantive law.  *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*,

957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S.

at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283,

1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court

must view the record and all reasonable inferences to be drawn from it in favor of the nonmoving

party.  *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d

599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  To

---

[9] Although Trainor bases his deliberate indifference and medical malpractice/negligence claims on the acts and omissions that occurred before he initiated this action, Medical Defendants continue to detail Trainor's medical needs, care, and treatment up until January 11, 2022.  While Trainor's gait appears to have worsened, his care and treatment responded appropriately (*i.e.*, he was issued a walker for much of 2020, 2021, and 2022; and periodically received additional short-term Baclofen prescriptions).  No other material change in Trainor's medical needs, treatment, or care is supported by the record.

avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## IV.    Analysis

Trainor asserts an Eighth Amendment deliberate indifference to serious medical needs claim against each Defendant. The Corrections Defendants argue that (1) Trainor's claim against Hays is barred by the statute of limitations, (2) Trainor has failed to administratively exhaust his remedies against Hays, Hartzell, and Rogers, and (3) the record does not support a finding that Rogers or Hartzell acted with deliberate indifference to Trainor's serious medical needs. The Medical Defendants argue that (1) the record similarly belies a finding that any of them acted with deliberate indifference, (2) Trainor has failed to identify a policy or custom of Wellpath that caused his alleged constitutional injury, and (3) Trainor's inability to offer expert testimony at

19

trial is fatal to his medical malpractice/negligence claim.  The Court will address each argument in turn.

### A. Trainor's claim against Hays is time-barred by the two-year statute of limitations.[10]

Hays contends that the applicable statute of limitations bars Trainor's claim pursuant to 42 U.S.C. § 1983.  The running of the statute of limitations is an affirmative defense that the defendant must plead and prove.  *See* Fed. R. Civ. P. 8(c)(1); *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989).  Claims pursuant to § 1983 are subject to the most analogous state statute of limitations, which, in Pennsylvania, is the two-year statute of limitations for personal injury actions.  *See Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); *Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 457 n.9 (3d Cir. 1996) (citing 42 Pa. C.S. § 5524).  *See also Wallace v. Kato*, 549 U.S. 384 (2007) (for § 1983 claims, "the length of the statute of limitations ... is that which the State provides for personal-injury torts.") (citing *Owens v. Okure*, 488 U.S. 235, 249-50 (1989) (in each state, § 1983 claims are governed by the state's "general or residual statute for personal injury actions")).  A cause of action accrues for statute of limitations purposes when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action.  *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998); *see also Nelson v. County of Allegheny*, 60 F.3d 1010 (3d Cir. 1995).  "The determination of the time at which a claim accrues is an objective

---

[10] Trainor's claim against Hays is based primarily upon his allegation that Hays did not provide him with the full extent of gym access he considered necessary for his physical condition.  It is undisputed, however, that Trainor was permitted significant use of the gym and other prison exercise equipment and was prescribed exercises he could perform on his own.  "[W]hether denial of access to exercise areas violates the Eighth Amendment depends on the length of the deprivation, the justification for the deprivation, the extent to which other opportunities for out-of-cell exercise are available, and the impact of the deprivation on the inmate's health and well-being."  *Riley El v. Illinois Dep't of Corr.*, 2013 WL 1283414, at *3 (N.D. Ill. Mar. 22, 2013).  Given the extent of the out-of-cell exercise opportunities that were provided to Trainor and Hays' reliance on medical personnel concerning Trainor's exercise requirements, the Court would also find that the record is insufficient to sustain his Eighth Amendment claim against Hays on the merits.

inquiry," concerned with "what a reasonable person should have known." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). According to the prison mailbox rule, the Court treats the filing of Trainor's complaint as August 3, 2020, the day he signed his complaint.[11] ECF No. 1, p. 10.

Hays contends that Trainor's claim against her is untimely because he filed this action more than two years after "[Trainor's] alleged inability to access the gym at SCI-Forest in October and November 2017." ECF No. 69, p. 4. Hays asserts that "[Trainor] was aware of this claim at the time it accrued because he filed inmate requests to staff contemporaneous with this claim." *Id.*, p. 6. Trainor counters that the "continuing violation" doctrine applies and sufficiently tolled or extended the limitations period on his claims. ECF No. 73, p. 22.

The continuing violation doctrine is an "equitable exception to the timely filing requirement" that applies "when a defendant's conduct is part of a continuing practice." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995) (superseded in part by statute, Lilly Ledbetter Fair Pay Act, Pub. L. No. 111-2, 123 Stat. 5 (2009)). This doctrine allows untimely actions to be considered timely "so long as the last act evidencing the continuing practice falls within the limitations period" by instructing the court to "grant relief for the earlier related acts that would otherwise be time barred." *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). The Court of Appeals for the Third Circuit has held that "[t]o prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts...." *Jewett v. Int'l Tel. and Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981). A "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir. 1982)

---

[11] Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]." *Galtoghab v. Doe*, 2016 WL 757739, at *3 (W.D. Pa. 2016) (quoting *Commonwealth v. Little*, 716 A.2d 1287 (Pa. Super. Ct. 1998)).

(quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)), *abrogated on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)).

The Court should consider three factors when determining whether a defendant's acts constitute a continuing practice or sporadic incident: (1) subject matter jurisdiction-whether the violations constitute the same type, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001).  The consideration of the "degree of permanence" is the most important factor to consider.  *Id.*

Here, Hays's involvement in Trainor's alleged Eighth Amendment injury extends no further than 2017.  Trainor appears to include Hays in his general deliberate indifference claim against the DOC Defendants because of her role as SCI-Forest's Activities Director.  Per the record, Trainor first complained about mandatory medication line ("med-line") times conflicting with activities scheduling and, thus, his gym access, in an October 14, 2017, Inmate's Request to Staff form he directed to CHCA Smith.  Smith explained in her response that "the practitioners decides [sic] what meds, what doses, & at what times," and told Trainor: "You can't dictate your treatment plan to suit your activities schedule."  ECF No. 1-5.  The next day, Trainor complained again about this timing conflict in another staff request form to Smith.  In her response, Smith reiterated that his medications "take priority" and that absent doctor's orders, his med-line times and activities schedule would not be changed.  ECF No. 1-6.

A day later, Trainor submitted a staff request form to "The Activity Department Hays / Howard / Hummel / Fiscus / Courter;" writing: "Today I met with medical staff and they are sending you a script/doctors order to get me into the gym on the bike at least 5x (times) a week. . . I have also fixed problem with medline pass at 10:00 - 10:25 daily to attend completely the activities." ECF No. 1-7.  He also complained that he had been wrongfully removed from the Tuesday schedule for inmates over 50 gym call-out sheet.  Hays responded on October 19, 2017, the same day as his first PT appointment, and stated that she removed him from the call-out list pursuant to the activities absence policy (he had two), but she had since placed him on the wait list.

Trainor next complained about his inability to access the gym because of the activities schedule and med-line times in a November 16, 2017, Request to Staff form directed to Hays, writing: "Miss Hays, I met with medical staff again today.  The problem of 10 AM Med-Pass interrupting 9AM 10AM activity time (therapy) *was solved*.  A letter of medical necessity and medical order is in transit to you now."  ECF No. 1-8 (emphasis added).  Before Hays responded, Trainor asked CRNP Marlowe in a November 24 request to staff form, "have you sent (physical therapy schedule) to Miss Hays for implementation?" Defendant HSA Lamoreaux responded to this submission on November 28, stating: "we do not send schedules to activities she does her scheduling."  ECF No. 73-2.

On November 29, 2017, Hays responded to Trainor's November 16 request to staff form, writing: "Again, I have spoken to medical and you are not to be given special treatment. You apply for programing like everyone else. . . you have been given things to do on your own." ECF No. 1-8.  Trainor submitted another request to staff form to Hays that day, stating: "the medical team, including CRNP Marlowe, CRNP Leslie and Physical Therapy Doctor Zappa

ha[d] approved 5 days a week therapy . . . with the two months of problems I had, I lost a few gym times because of new/problem med line time. *The problem is corrected* and implementation of my therapy/activity schedule is ready now." ECF No. 73-3 (emphasis added).  That day, Hays responded: "I spoke to Ms. Smith and she informed me you were told you can come to the gym for the same time as any other inmate. You do not get extra, please follow regular sign up procedures." *Id.*  These documents represent the entirety of the evidence in the summary judgment record concerning Trainor's inability to access the gym because of his conflicting activities schedule and med-line times.

Trainor contends, however, that his claim against Hays accrued through 2021 because "his gym access complaints were ongoing through the years 2018, 2019, 2020, and 2021." ECF No. 73, p. 22.  But the record is devoid of evidence that Hays prevented him from accessing the gym within two years of this complaint.  The only reference to Hays in the record is in a request to staff form Trainor submitted to Warden Overmeyer on December 28, 2017.  Therein, Trainor asserted that he has been suspended from the gym because a security corrections officer wrongfully wrote him up, and he asks Overmeyer to help him "be back into regular gym activities re-activated Monday through Thursday," as well as an additional session on Fridays (five total).  ECF No. 73-6, p. 2.  Trainor added that "C. Hays, months ago requested medical approval for any extra weight room," and that he has since fulfilled her request "by getting 5 (activities times) approved by Medical."  *Id.*  Smith responded on January 4, 2018, writing: "Trainor is not on a physical therapy program. Mr. Zappa is not a Dr. He provides guidance & instruction on what exercises can be done . . . medical is not ordering or approving anything additional from gym activity that would not be routinely available to him." ECF No. 73-6.

The record also belies that Trainor was continuously prohibited from completing his medically mandated physical therapy exercises because of activities policies. The record confirms that "[Zappa] instructed [Trainor] to use the lower extremity strengthening gym equipment and continue his use of the stationary bike and elliptical unit" on October 19, 2017, and that med-line times prohibited Trainor from accessing the gym for at least a month afterwards. ECF No. 57, ¶ 11; *see* ECF No. 57-1, p. 58-9. However, the record shows that the med-line problem was fixed by December 2017. Furthermore, nothing in the record supports Trainor's contention that a medical provider ordered him to attend the gym five times a week. Zappa's PT note dated January 4, 2018, stated that Trainor's PT program includes 3-5 gym sessions a week. Accordingly, the record does not demonstrate that Trainor was continuously, if ever, precluded from completing his medically issued PT program. As such, Hays's alleged violations extended no further than December 2017, more than two years before Trainor initiated this action.

Trainor also argues that he filed grievances related to his claim against Hays such that the statute of limitations was sufficiently tolled. The statute of limitations for § 1983 actions is tolled while the prisoner exhausts the administrative remedies available to him because such exhaustion is mandatory under the Prison Litigation Reform Act. *Wisniewski v. Fisher*, 857 F.3d 152, 158 (3d Cir. 2017) (citing *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015)). A plaintiff is not deemed to have exhausted his administrative remedies until a final appeal decision on his grievance. *See Fennell v. Cambria Cty. Prison*, 607 Fed. Appx. 145, 149 (3d Cir. 2015) ("proper exhaustion" means a prisoner's completion of the administrative review process).

Defendants contend that Trainor did not file any grievance related to his asserted inability to access the gym at SCI-Forest in October and November of 2017. To support this position, Defendants have submitted a list of Trainor's grievances and Grievance No. 819790 and related documents. Additionally, they have provided sworn declarations from SCI-Forest Grievance Coordinator Lisa Reeher and SOIGA Grievance Review Officer Michael "Skip" Bell attesting that Trainor did not grieve any issues related to accessing the gym in October or November of 2017 and did not file any grievance identifying Hays in that timeframe. Trainor argues that because Defendants did not submit the grievance record of each of his 156 grievances, they have failed to meet their burden to show that "the statute of limitations was not tolled while Mr. Trainor exhausted the grievance process." ECF No. 73, p. 23. But Trainor has not submitted evidence to refute Defendants' position. Trainor "may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit." *Van Horn v. Suhor Indus., Inc.*, 829 F. Supp. 2d 321, 325 (W.D. Pa. 2011) (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990)). "Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial." *Id.* Accordingly, because Trainor's claim against Hays was neither based on a violation that continued after 2017 nor tolled by a grievance, his claim against Hays is time-barred.

**B. Trainor exhausted his administrative remedies against Hartzell and Rogers.**

"The Prison Litigation Reform Act of 1995 (PLRA) requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court." *Woodford v. Ngo*, 548 U.S. 81, 81 (2006). "Exhaustion is considered separately for each claim

26

brought by an inmate, and if a complaint includes both exhausted and unexhausted claims, courts will dismiss the latter but not the former." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (citing *Jones v. Bock*, 549 U.S. 199, 219-20 (2007)). The failure of an inmate to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove. *See Jones*, 549 U.S. at 216.

The Supreme Court has held that the PLRA requires "proper exhaustion," meaning "complet[ing] the administrative review process in accordance with the applicable procedural rules," *Woodford*, 548 U.S. at 88, which are supplied by the individual prisons, *Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). To determine whether exhaustion was proper, the court "evaluat[es] compliance with the prison's specific grievance procedures," which in Pennsylvania's state prison system are set out in DOC Policy DC-ADM 804, "and analyz[es] whether the procedures were 'available' to the inmate." *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010)) (citing *Small v. Camden County*, 728 F.3d 265, 269, 271 (3d Cir. 2013); 42 U.S.C. § 1997e(a)). The purpose of this stringent application of the exhaustion requirement is to alert the prison officials to a problem and allow the officials to remedy the problem before it is litigated in court; it is "not to provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d. Cir. 2007) (quoting *Jones*, 549 U.S. at 219 (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004))).

Defendants contend that Trainor did not exhaust his administrative remedies for his Eighth Amendment claim against Hartzell and Rogers because he did not adhere to the DC-ADM 804's procedural requirements. To properly exhaust, DC-ADM 804 requires an inmate to

complete three stages: (1) initial review; (2) appeal; and (3) final review. *See* Grievance System

Policy DC ADM-804; *Smith v. Sec. of Pa. Dept. of Corrections*, 2018 WL 279363, at *2 (W.D.

Pa. Jan. 3, 2018).  First, within fifteen days of the incident, the inmate must "legibly set forth all

facts and identify all persons relevant to his claim in a grievance" submitted for review by the

facility manager or the regional grievance coordinator, who, in turn, must respond in writing

within fifteen business days. *Smith*, 2018 WL 279363, at *2 (citing *Spruill*, 372 F.3d at 233).

Second, if the inmate disagrees with the response, he may appeal to the Facility Manager within

fifteen working days; the Facility Manager then has fifteen working days to respond to the

appeal. *See Jackson v. O'Brien*, 2021 WL 5087922, at *3 (W.D. Pa. Nov. 2, 2021).  Finally, if

the inmate remains dissatisfied, he has fifteen working days to appeal to the Secretary's Office of

Inmate Grievances and Appeals ("SOIGA"), which then must issue a final determination within

thirty working days. *See Downey v. Pa. Dep't of Corrs.*, 968 F.3d 299, 305-06 (3d Cir. 2020).

Proper exhaustion extends to the substance of the grievance as well.  Neither the PLRA nor DC-

ADM 804 has a "name all defendants" requirement. *See Byrd v. Shannon*, 715 F.3d 117, 127 (3d

Cir. 2013) (citing *Jones*, 549 U.S. at 217); *Barclay v. Stabley*, 2021 WL 463651, at *4 (M.D. Pa.

Feb. 9, 2021) ("There is no requirement in DC-ADM 804 that a prisoner must name the

individuals that were involved").  But Section 11(d) of DC-ADM 804 mandates that the inmate

"shall identify individuals directly involved in the events." *Green v. Maxa*, 2020 WL 1249205, at

*5 (W.D. Pa. Mar. 16, 2020). *See also* Jackson *v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir.

2020).  Because the identification requirement is mandatory, "in the absence of any justifiable

excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to

properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*,

146 Fed. Appx. 554, 557 (3d Cir. 2005) (failure to identify defendants in grievances "means that

[plaintiff] failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA").

Here, Trainor grieved his Eighth Amendment deliberate indifference claim against Hartzell and Rogers in Grievance No. 8019790. Trainor filed this grievance on August 26, 2019, and received an Initial Review Response (IRR) denying his claim on September 6, 2019. He then appealed to the facility manager, and the facility manager remanded his grievance back "to the respective Grievance Officer for additional review and appropriate response." ECF No. 71-1, p. 57. Trainor then received a remanded IRR, which he subsequently appealed as well. Trainor received another response from the facility manager, and then filed an appeal with SOIGA. Thereafter, SOIGA dismissed his grievance because "[he] failed to provide a copy of [his] first appeal to the facility manager." *Id.*, p. 61.

Defendants argue that Trainor failed to properly exhaust his claim because SOIGA dismissed his grievance for a procedural default. But as Trainor correctly notes, the "DC-ADM does not require a grievant to provide a copy of his first appeal to the facility manager in a situation where the facility manager remands the appeal for further review." ECF No. 73, p. 23. Indeed, the DC-ADM states that "[a] proper appeal to final review must include," *inter alia*, "a copy of the Facility Manager/designee's decision *and/or* remanded Facility Manager/designee's decision." *Id.*, pp. 23-24 (quoting DC-ADM, Section 2.B.1.j., pp. 2-6) (emphasis added). In support of their position, Defendants have submitted grievance forms related to Grievance No. 8019790, but Defendants have not included a copy of Trainor's appeal to SOIGA nor a declaration attesting to the completeness and authenticity of this grievance record. Accordingly, the Court cannot rely upon these documents to determine whether Trainor failed to include the remanded facility manager decision in his appeal to SOIGA. *See Sims v. Wexford Health*

*Sources*, 2015 WL 4041771, at *5 (W.D. Pa. July 1, 2015), *aff'd*, 635 Fed. Appx. 16 (3d Cir.

2015) (DOC Defendants . . . .fail[ure] to authenticate [the copies of the grievance documents]

with a sworn declaration certifying that they constitute a complete and accurate record of

Plaintiff's grievance proceedings" precluded the court from "rely[ing] on such documents to

definitively conclude that Plaintiff ha[d] failed to exhaust."). Accordingly, the Court cannot hold

as a matter of law that Trainor has failed to exhaust Grievance No. 8019790 because of a

procedural deficiency. *See Watkins v. Merriel*, 2015 WL 5722819, at *8–10 (D.N.J. Sept. 29,

2015) (finding that there were genuine issues of disputed facts regarding whether an inmate filed

IRF appeals when there was "at least some record evidence suggesting that Plaintiff did not

receive responses from prison officials related to some IRFs he submitted"); *Ortiz v. Hayman*,

2008 WL 1319203, at *4 (D.N.J. Apr. 10, 2008) (holding that summary judgment is

inappropriate when there was a dispute of fact whether plaintiff actually submitted an IRF when

the plaintiff claims he sent an IRF and the defendants claim they never received an IRF); *Ball v.*

*Bower*, 2012 WL 1414827, at *3 (M.D. Pa. Mar. 22, 2012), *report and recommendation*

*adopted*, 2012 WL 1414771 (M.D. Pa. Apr. 24, 2012) (collecting cases).

Defendants additionally contend that, "although appealed to final review, [Trainor] also

failed to identify Corrections Defendant Hartzell." ECF No. 69, p. 12. Proper exhaustion

extends to the substance of the grievance as well. As noted, section 11(d) of DC-ADM 804

mandates that the inmate identifies individuals directly involved in the events upon which the

grievance is based. *Green*, 2020 WL 1249205, at *5 (citation omitted). Nevertheless,

"exhaustion is not *per se* inadequate simply because an individual later sued was not named in

the grievances." *Jones*, 549 U.S. at 219. Indeed, courts in the Third Circuit have found that

inmates may adequately identify individuals in a grievance without using their names. For

30

example, "[i]dentifying someone by position has been held to fulfill the DC-ADM 804's identification requirement." *Travillion v. Wetzel*, 765 Fed. Appx. 785, 789 (3d Cir. Apr. 8, 2019) (citing *Johnson v. Johnson*, 385 F.3d 503, 523 (5th Cir. 2004) (noting "a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice)). *See also Diaz v. Palahovich*, 448 Fed. Appx. 211, 217 (3d Cir. Oct. 4, 2011) (determining that inmate's identification of "mailroom staff," along with grievance officer's subsequent interview of mailroom employees, obviated any procedural default that may have resulted from failure to specifically name mailroom employees). A plaintiff's failure to name individuals in his grievance has also been excused where the prison conducts an internal investigation and relies upon that investigation in its grievance response. *See Chaney v. Bednard*, 2020 WL 7864202, at *3 (W.D. Pa. Dec. 31, 2020) ("although [Plaintiff's] failure to identify the Defendants by name in his grievance constituted a procedural default, prison personnel excused this default for all but one of the Defendants when they identified six of the seven Defendants in their internal investigation responding to [Plaintiff's] grievance."); *Martin v. Secretary of Corrections*, 2018 WL 1158250, at *4 (M.D. Pa. Mar. 5, 2018) (Plaintiff, who was knocked unconscious during an assault, was excused from default for failure to identify Defendants when each Defendant filed reports afterwards identifying them as participants in the assault incident); *Schultz v. Doher*, 335 F.Supp.3d 177, 185 (D. Mass. 2018) (excusing Plaintiff's default for failure to identify when officers involved in use of force incident wrote incident reports summarizing the incident). And courts within the Third Circuit routinely find that a prison excuses an inmate's procedural default when its response to the grievance "identif[ies] the unidentified persons and acknowledg[es] that they were fairly within the compass of the

prisoner's grievance." *Spruill*, 372 F.3d at 234-35. *See Williams v. Beard*, 482 F.3d 637, 639-40 (3d Cir. 2007); *Robinson v. Johnson*, 343 Fed. Appx. 778, 782 (3d Cir. 2009); *Tenon v. Dreibelbis*, 606 Fed. Appx. 681, 687 n.5 (3d Cir. 2015); *Richardson v. Folino*, 2012 WL 6552916, at *14 (W.D. Pa. Dec. 14, 2012) (though Plaintiff's grievance failed to name the prison official who allegedly wronged him, he exhausted his administrative remedies because prison response to the grievance named Defendant prison official as the responsible party).

In his Official Inmate Grievance, Trainor writes:

> On 8-14-19 Wednesday I submitted a sick call request . . . I was concerned my left leg/foot . . . was broken. . . I was told by (2) med-pass nurses that they were informing the triage. Miss Rogers even made a point to come back and tell they [sic] knew and were coming to get me on Monday. No one ever came.

ECF No. 71-1, p. 53. In the IRR, the Grievance Officer recites that Trainor spoke with med-nurses the week before the IRR was issued regarding his swollen foot, and that they told him "they knew and were coming to get (him) on Monday." *Id.*, p. 56. Although Trainor only names Rogers in his grievance, he identifies Hartzell by her job title, states the date of the interaction with Hartzell and Rogers, and provides details about the interaction sufficient for a reviewing official to deduce the place and time. These allegations are therefore sufficient to provide prison officials with notice of Trainor's alleged problem. *See e.g.*, *Travillion,* 765 Fed. Appx. at 789 (Plaintiff sufficiently identified the prison official defendants whom he referred to as "RHU Staff and Unit Management" in his grievance, as well as the defendants he referred to as "SCI-Rockview staff and/or administration."). Accordingly, Trainor exhausted his administrative remedies for his Eighth Amendment claim against Hartzell and Rogers.

## C. Eighth Amendment Deliberate Indifference Claim

Trainor alleges that Defendants acted with deliberate indifference to his disability and associated health issues from when he first transferred to SCI-Forest in January 2017, to the initiation of this action in August 2020.  He additionally asserts that Wellpath manifested deliberate indifference to his medical needs by failing to implement a proper physical therapy program at SCI-Forest.  *See* ECF No. 73, p. 22.  Corrections Defendants and Medical Defendants argue that the record does not support a finding of deliberate indifference to Trainor's serious medical needs on the part of any Defendant.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *See Estelle v. Gamble*, 429 U.S. 97 (1976)) (internal quotation omitted).  To establish a violation of his constitutional right to adequate medical care, a plaintiff must allege facts that demonstrate: (1) he had a serious medical need, and (2) acts or omissions by prison officials that reflect deliberate indifference to that need.  *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A serious medical need exists when a "failure to treat can be expected to lead to substantial and unnecessary suffering."  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).  Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury."  *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

The verified complaint's allegations concerning the nature and severity of Trainor's chronic back and lower extremity pain, leg swelling and tremors, and right and left toe fractures, satisfy the "serious medical need" element of his Eighth Amendment claim.  *See* ECF No. 1.

The medical records also confirm that Trainor suffered from these ailments during the relevant time period. *See e.g.*, ECF No. 57-1, pp. 2, 58, 59, 259-60. Accordingly, only the second prong of the deliberate indifference test is at issue here: whether the treatment of Trainor's leg and back pain, leg issues, and right and left toe fractures manifested deliberate indifference to his serious medical needs.

It is well-settled that "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." *Tillery v. Noel*, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). Such complaints fail as constitutional claims because "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")). "Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983." *Tillery*, 2018 WL 3521212, at *5 (citing *Gause v. Diguglielmo*, 339 Fed. Appx. 132 (3d Cir. 2009) (characterizing a dispute over pain medication as the type of "disagreement over the exact contours of [plaintiff's] medical treatment" that does not violate the constitution)).

Similarly, "the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation." *Id.* (quoting *Estelle*, 429 U.S. at 106). "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). And the Third Circuit has

made clear that "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Wisniewski v. Frommer*, 751 Fed. Appx. 192, 195-96 (3d Cir. Oct. 3, 2018) (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017)). Thus, "courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care." *Hensley v. Collins*, 2018 WL 4233021, at *3 (W.D. Pa. Aug. 15, 2018) (quoting *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000)).

Trainor asserts that deliberate indifference was manifested by Defendants' failure to "respond reasonably to the ongoing risk of harm," "take reasonable action to abate [his condition]," give Trainor "pain medication to relieve his pain and suffering," and provide Trainor with "an adequate therapy room" despite Defendants' "knowledge that there were deficiencies within the medical care system that created a risk of the kind that caused [Trainor's] condition to worsen." ECF No. 1, ¶¶ 110, 115, 116, 118. Trainor further avers that "non-medical prison officials refused to provide [him] any medical accommodation because of the medical department's unwillingness to alert prison staff of [his] serious medical needs," including a double mattress, walker, wheelchair, gym equipment, therapy, "different meal times," "a handicap table pass," "specialized times for med-line," and "to be seen by a Dr." ECF No. 1, ¶ 114, 69. Trainor contends that because he was denied proper treatment, he broke his left and right feet and has permanent scarring, discoloration, and nerve damage in his left leg.

### 1. Medical Defendants' treatment of Trainor's chronic back and related leg issues did not constitute deliberate indifference.

Medical Defendants counter that Trainor's deliberate indifference claim is unsupported by his extensive medical records. They maintain that the medical records demonstrate that Trainor "received considerable, timely, adequate, and appropriate care for his medical issues

including his disability and resulting conditions." ECF No. 57, p. 12.  Additionally, Medical

Defendants argue that Trainor's deliberate indifference claim against Wellpath fails because he

has not identified a policy, custom, or practice that caused his alleged constitutional harm.  The

Court agrees.

Because the record does not support a finding of deliberate indifference, Trainor's Eighth

Amendment claim fails against all individual Defendants.  The voluminous medical records

produced by Defendants reveal that Trainor received consistent and extensive medical

assessments, treatment, and follow-up care throughout the time relevant to this action.  Since

Trainor's transfer to SCI-Forest in January 2017 to his filing of this action, he had three physical

therapy appointments and at least 60 medical visits, 57 of which were from Leslie and

Sutherland.  Most of these appointments were in response to his sick call requests; the remainder

were for his regular dyslipidemia, pulmonary, hypertension, and CCC appointments.  According

to the medical records, Trainor was scheduled for additional appointments; however, he declined

to attend his first PT appointment on February 23, 2017 and CCC visit on April 5, 2017;  he did

not show up for an October 11, 2017 Telemed CCC visit, nor for sick call visits on February 20,

2017, November 8, 2017, on January 14, 2020; and did not respond to Leslie's knocks on his

RHU cell door for sick call visits on April 30, 2018, May 21, 2019, and August 19, 2020 (twice).

Trainor received medical attention from doctors during this time as well.  According to

the medical records, Dr. Maxa consulted on Zappa's PT notes and referred him for a follow-up

appointment, and oversaw the treatment of his left and right toe fractures, including ordering x-

rays, reviewing the results, and issuing the treatment plan.  He also approved an echocardiogram

and consulted with Sutherland about Trainor's treatment on several occasions.  Additionally, Dr.

David Lohan advised on Trainor's echocardiogram, Dr. Amanda Hartwell responded to

Trainor's sick call request on December 18, 2020, and Physician's Assistant Dakota Testa responded to Trainor's December 23, 2019, sick call request.

The medical records demonstrate that Sutherland, Leslie, Dr. Maxa, and the other providers addressed Trainor's numerous medical concerns at each of these visits, and conducted examinations, ordered diagnostics, prescribed medications, and issued additional therapies in accordance with his identified medical needs. Indeed, the medical providers ordered numerous diagnostics, including comprehensive and basic metabolic panels, lipid screens, urine cultures, urinalyses, x-rays, hemoccult labs, prostate specific antigen bloodwork, and an echocardiogram. From their examinations and diagnostics, the medical providers identified medical issues including back and leg pain, a toothache, gait and mobility abnormalities, moderate persistent asthma, hyperlipidemia, eczema, ischemic cardiomyopathy, urinary tract infections, odontogenic abscess, hypokalemia, edema, hypertension, bronchitis, and tremor/spasms. *See* ECF No. 57-1, pp. 640-41. And to treat these health problems, they prescribed a variety of medications, including antibiotics for his infections (Bactrim DS, Levaquin, Cleocin, Sufatrim, Penicillin, Azithromycin and Mucosa), hydrocortisone cream for his eczema, an inhaler for his asthma (Alvesco), a potassium supplement, medication for his high blood pressure and symptomatic edema (Prinzide, HCTZ Microzide, and Lisinopril), Lipitor for his cholesterol; and, for his chronic back and leg pain and leg spasms, Trainor received daily doses of Baclofen, Neurontin/Gabapentin, and Tylenol, and sometimes a non-steroidal anti-inflammatory as well (*e.g.*, Diclofenac and Voltaren). In fact, even when Sutherland discontinued Trainor's Tylenol for a few days in April 2018, and tapered him off Neurontin in January after Trainor had been caught allegedly attempting to divert his pills, Trainor still received his other pain medications. *See* ECF No. 57-1, pp. 48, 580.

37

Trainor complains that Defendants' deliberate indifference also manifested in their refusal to issue him ACE wraps, a permanent walker and wheelchair, double mattress, different mealtimes, a handicap table pass, and a shower stall. But the medical records show that these decisions were based on medical decisions and prison policy (ACE wraps were a security concern in the RHU and unnecessary because he received compression socks, a double mattress was not an option, and he did not exhibit the symptoms necessary for disability meal and shower accommodations). With respect to a walker and wheelchair, the medical records show that medical providers issued Trainor a walker or wheelchair whenever they deemed it medically necessary, and confiscated or denied the walker or wheelchair when they found the opposite, such as when Trainor was observed moving well without a walker or doing leg lifts at the gym. And throughout much of this time, Trainor received insoles and regularly replaced compression socks. What's more, Sutherland placed him on a contact sports restrictions and recommended he receive ground level or lower bunk bed assignments. *See* ECF No. 57-1, p. 40. Thus, Trainor's receipt of assistive devices and medical accommodations were based upon medical decisions, and, thus, not demonstrative of deliberate indifference.

The records additionally negate Trainor's claim that he was denied physical therapy and prohibited from completing his physical therapy treatment. Although Trainor's PT with Zappa was discontinued after his January 4, 2018, appointment, Trainor does not allege that he sought and was denied additional appointments and no record supports this conclusion. As to the physical therapy treatment, Zappa also gave Trainor strengthening and stretching exercises that did not incorporate gym equipment and could be, and were, completed in his cell. The records also show that after the med-line conflict was fixed in late 2017, Trainor had access to gym equipment, even when in the RHU, and had the option of walking outside. And the medical

records belie Trainor's repeated assertion that his medical treatment included five required gym sessions a week.  In fact, the only arguable support for this assertion is Zappa's PT note of January 4, 2018, wherein he wrote that Trainor should use the gym *three to five* times a week. This note was authored more than two months after Trainor began demanding access to the gym five times a week and clearly recommended a range of frequency of gym use, not a mandate for five days per week.

Courts have routinely found that regular assessment, treatment, and care like that provided in this case negates a finding of deliberate indifference under the Eighth Amendment. *See, e.g.*, *Payo v. Stechschulte*, 2022 WL 912588, at *7 (W.D. Pa. Mar. 29, 2022) (No deliberate indifference found where it was undisputed that "Plaintiff was seen, evaluated and treated on a regular basis and was prescribed medication as medically needed."); *Gause*, 339 Fed. Appx. at 135 (Deliberate indifference standard unmet where "[Plaintiff's] medical records show that he was seen many times by the prison medical staff and received medicine, physical therapy, and even treatment outside of the prison," thus establishing that "[Plaintiff] received medical care."). Trainor's disagreements with his medical providers, available gym equipment, and prison policies setting times for the med-line and accessing the gym and prohibiting inmates in the RHU from receiving a stationary bike in an RHU cell do not support a finding of deliberate indifference.

### 2. Defendants' response to and treatment of Trainor's fractured toes did not constitute deliberate indifference.

Trainor additionally alleges that the Medical Defendants' deliberate indifference to his medical needs caused him to fracture his left toe on August 14, 2019 and right toe on October 31, 2019, and that Defendants' response to his fractured toes constituted further acts of deliberate indifference.  According to Trainor's verified complaint, his "medical condition progressively

worsened" when he was in the RHU in the summer and fall of 2019.  ECF No. 1, ¶ 83.  Trainor

avers that "[d]uring the late months of 2019, [he] began to lose muscle mass," his "muscle

spasms increased with frequency, and [his] pain intensified."  *Id.*  He further asserts that his pain

made traveling "from his bed to his cell door to receive his medication and food three times a

day" so challenging that he "missed approximately forty meals" and "lost about 30 lbs during

this R.H.U. visit."  *Id.*, ¶ 84, 85, 86.  Trainor contends that his "legs became so weak as a result

of the Defendant's [sic] failure to attend to [his] serious medical needs that as he got to his feet,

his leg gave way and [he] broke his left foot."  *Id.*, ¶ 89.  Trainor alleges that, "on October 31,

2019, due to [his] degenerating condition, [he] broke his right foot attempting to get out of bed."

*Id.*, ¶ 100.

The medical records negate that Trainor received inadequate care and treatment in the

days and weeks leading to his injury on August 14, 2019.  Indeed, Trainor received a visit from

Sutherland on July 1, July 3, July 12, July 16, and August 5, 2019.  Sutherland memorialized in

his notes that he observed Trainor walking well independently in early July, and assessed his leg

edema and ischemic cardiomyopathy.  Sutherland also replaced Trainor's TED hose and denied

his request for ACE wraps after consulting with Dr. Maxa and the CHCA, who informed

Sutherland that ACE wraps posed a security risk to inmates in the RHU.  At Trainor's

appointment on August 5, 2019, Sutherland denied his request for additional protein after

assessing his vitals and determining that extra food was not medically necessary.  Sutherland

also noted that Trainor's BMI did not warrant additional meals.

The medical records also refute Trainor's claim that he lost thirty pounds during this

period.  When Trainor first entered SCI-Forest in January 2017, he weighed 226.  *See* ECF 57-1,

pp. 65-66.  On April 25, 2019, he weighed an additional eighteen pounds (244).  *See id.*  On

July 3, 2019, he was five and half pounds lighter, and on October 25, 2019, another eleven pounds lighter. *See id.* These numbers neither support a claim that he had lost a concerning amount of weight in the time period leading up to his toe injury or that his weight during that time should have triggered medical concern. Thus, as the Medical Defendants point out, Trainor received continual treatment and care during the time leading up to his toe fractures.

Likewise, the Defendants response to Trainor's fractured toes did not constitute deliberate indifference. Trainor avers that he "received no treatment for his broken feet whatsoever" because "[he] was not given ice, increased pain medication, or a walker for use in his cell," and his feet were not "bandaged or placed in a cast." ECF No. 1, ¶ 98. Trainor fractured his second toe on his left foot on August 14, 2019. According to Trainor, he informed CRNPs Hartzell and Rogers that day at med-line that he may have broken his foot, and Rogers responded: "looks bad, I'll contact triage." ECF No. 1, ¶ 90. Trainor also submitted a sick call on August 14. Trainor asserts that he "repeatedly reported his broken foot during med-pass," and that CRNP "Rogers repeatedly informed [him] during med-pass that 'it looks bad, triage was notified." *Id.*, ¶ 92. He submitted another sick call on September 1 and received a visit from Sutherland on September 4, 2019. Trainor maintains that at this visit, he told Sutherland about his foot, and "Sutherland claimed he would have him seen by medical." *Id.*, ¶ 94. Trainor submitted a third sick call and was seen by Sutherland specifically to examine his foot injury on September 16, 2019. After examining Trainor's left foot, Sutherland ordered an x-ray for the following day. Trainor avers that the x-ray "confirmed that [he] had suffered a fracture in his left foot." *Id.*, ¶97. According to Trainor, he received no treatment or care for his fractured left toe or for his injured right third toe, which he hurt on October 31, 2019.

The medical records reveal, however, that Trainor received pain medication following the fractures to his left and right toes and the healing process. These records also show that the medical providers determined that his injuries did not warrant additional treatment. At the time of his foot injury, and throughout the healing process, Trainor regularly received daily doses of Tylenol, Neurontin, and Baclofen. Although these pain medications were prescribed for his chronic leg and back pain, the medical providers decided not to prescribe Trainor additional pain medication for his toe injuries. This medical judgment does not constitute deliberate indifference.

After Dr. Maxa reviewed the September 17 x-ray, he issued Trainor a wheelchair for him to use for longer distances. And when Trainor returned the wheelchair on October 22, 2019 because it was broken, Dr. Maxa determined that the wheelchair would be replaced by a 4-wheel walker and walking boot. The medical providers similarly decided not to issue Trainor additional pain medication or other treatment upon realizing he had fractured his third toe on his right foot. Because the records show that Defendants utilized medical judgment in determining the treatment of Trainor's toes, the record does not support that the Medical Defendants acted with deliberate indifference to his toe injuries.

Trainor also appears to argue that a delay in his treatment constituted deliberate indifference. According to the Medical Defendants, Leslie attempted to visit Trainor twice on August 19, 2019 to assess his foot, but Trainor did not respond to him. Trainor denies that Leslie attempted to see him that day, but, while Leslie's attempted visits are memorialized in his medical note that is included in the record, Trainor has not cited to any record evidence to support his denial. Based on the medical record, there is no basis for a finding that Trainor could have or should have received care weeks earlier. Furthermore, the medical records show that

Trainor's treatment plan would not have changed had Leslie examined him on August 19 and
that Trainor consistently received pain medication following his toe injury. And later x-rays
revealed that his toes healed properly despite any alleged delay in his initial medical assessment.
Thus, any delay in treatment for Trainor's fractured left toe did not amount to deliberate
indifference. *See Williams*, 223 Fed. Appx. 95 (eleven months between injury and surgery not a
constitutional violation where record shows sufficient medical treatment); *McCloskey v. Welch*,
803 Fed. Appx. 578, 581 (3d. Cir. 2020) (medical director was not deliberately indifferent where
Plaintiff, who had fractured his intramedullary rod on June 3, 2013, received an x-ray on
June 14, 2013, and surgery eight weeks after the injury but no continuous medical care in-
between); *see also Fields v. Delaware Dep't of Corr.*, 787 Fed. Appx. 796, 798 (3d Cir. 2019).

     In summary, the record does not support any delay in care sufficient to rise to the level of
an Eighth Amendment violation. While Trainor may disagree with the course of treatment he
received for his injury, he fails to establish that this treatment was constitutionally deficient. *See,
e.g., Payo*, 2022 WL 912588, at *8 ("Without more, however, his disagreement does not support
an Eighth Amendment claim or demonstrate deliberate indifference to his serious medical
needs.); *Young v. Quinlan*, 960 F.2d 351, 358 n.18 (3d Cir. 1992) ("an inmate's disagreement
with prison personnel over the exercise of medical judgment does not state a claim for relief.").

     The record is similarly inadequate to support a finding that Hartwell and Rogers were
deliberately indifferent to his fractured toe injury. Corrections Defendants correctly argue that
the record does not support Hartzell and Roger's involvement in any alleged denial or delay of
medical care for Trainor's left toe. Shortly after Hartzell and Rogers told Trainor that they
notified triage of his injury, Leslie attempted to see him in his cell. Even assuming Leslie failed
to visit Trainor's cell on August 19, the record does not support that Hartzell or Rogers knew of

and intentionally disregarded any medical providers failure to assess and treat his injury.
Viewing the evidence in the light most favorable to Trainor, a reasonable jury could not find the
requisite subjective awareness to support Trainor's claims of deliberate indifference against
Hartzell or Rogers.  ECF No. 69, p. 17.  *See Davis v. Superintendent Somerset SCI*, 597 Fed.
Appx. 42, 46 (3d Cir. 2015) (citing *See Schieber v. City of Phila.*, 320 F.3d 409, 421 (3d
Cir.2003)) ("Davis's allegation that she did not sufficiently react to his complaint of pain does
not substitute for a plausible allegation that she actually knew Davis required medical treatment
other than that which he was already receiving.").

At best, Trainor's allegations support his belief that his medical needs warranted
treatment different from what he received.  A prisoner's differences of opinion with medical
personnel do not support an inference of deliberate indifference.  The record does not support an
inference that Sutherland, Leslie, Maxa, Lamoreaux,[12] Wellpath,[13] Hartzell, or Rogers
"deliberately or intentionally denied reasonable requests for medical treatment or knew of and
disregarded an excessive risk to [Trainor's] health."  *Payo*, 2022 WL 912588, at *7.
Accordingly, judgment will be entered in favor of the Defendants on Trainor's Eighth
Amendment claim.

---

[12] The Court also notes that Lamoreaux is a Health Services Administrator, not a medical care provider.  *See Thomas v. Dragovich*, 142 Fed. Appx. 33, 39 (3d Cir. 2005)); *Fantone v. Herbik*, 528 Fed. Appx. 123, 128 n.6 (3d Cir. 2013); *Roberts v. Tretnick*, 2014 WL 4218249, *3-4 (W.D. Pa. 2014); *McEachin v. Wilson*, 2009 WL 5206008, *13 (W.D. Pa. 2009).  The record shows that Trainor received regular care by medical personnel and thus does not support an inference that Lamoreaux  had "reason to believe that the prison doctors were either mistreating or not treating [Trainor]." *Fantone*, 528 Fed. Appx. at 128.  And even if Lamoreaux "could have been more helpful to [Trainor] by undertaking" certain "actions . . . a failure to undertake such actions or others like them does not constitute deliberate indifference and may not be legally recognized as such." *Thomas*, 142 Fed. Appx. at 39 (3d Cir. 2005).

[13] The failure of Trainor to show that Sutherland, Leslie, Lamoreaux, and Dr. Maxa acted with deliberate indifference to his serious medical needs precludes a Section 1983 claim against Wellpath, their employer, based on any policy, practice, or custom Trainor alleges it maintained.  *See e.g., Stankowski v. Farley*, 251 Fed. Appx. 743, 748 (3d Cir. 2007) (Because plaintiff could not allege that "the nurses' practice of not distributing bandages until the patient sees a doctor" violated the Eighth Amendment, he could not show that the nurses' employer "adopted any policy, custom, or practice that caused any constitutional violations").

### D.   Medical Malpractice Claim

Trainor also asserts a medical malpractice/negligence claim against the Medical

Defendants under Pennsylvania state law.  To support such a claim, Trainor must establish the

following elements

> (1) the [medical professional] owed a duty to the patient; (2) the
> [medical professional] breached the duty; (3) the breach of duty
> was the proximate cause of, or a substantial factor in, bringing
> about the harm suffered by the patient; and (4) the damages
> suffered by the patient were a direct result of that harm.

*Grant v. Pennsylvania Dep't of Corr.*, 2021 WL 4312451, at *12 (W.D. Pa. Aug. 6, 2021),

*report and recommendation adopted*, 2021 WL 3828146 (W.D. Pa. Aug. 27, 2021) (quoting *Doe*

*v. Hosp. of Univ. of Pa.*, 546 F. Supp. 3d 336 (E.D. Pa. 2021)).

Rule 1042.3 of the Pennsylvania Rules of Civil Procedure generally requires a plaintiff

asserting a medical or professional malpractice claim to file a Certificate of Merit ("COM") for

each defendant who is the subject of the claim either with the complaint or within 60 days

thereafter.  *See* 231 Pa. Code Rule 1042.3(a).[14]  The COM must attest that there is a reasonable

probability that the medical or other professional care described in the complaint fell outside of

acceptable professional standards.  The Third Circuit has held that Rule 1042.3 is substantive law

---

[14] Rule 1042.3(a) of the Pennsylvania Rules of Civil Procedure states:
    (a)  In any action based upon an allegation that a licensed professional deviated from an acceptable
        professional standard . . . the plaintiff if not represented, shall file with the complaint or within
        sixty days after the filing of the complaint, a certificate of merit signed by the . . . party that either

        (1)  an appropriate licensed professional has supplied a written statement that there exists a
        reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment,
        practice or work that is the subject of the complaint, fell outside acceptable professional standards
        and that such conduct was a cause in bringing about the harm, or . . .

        (2)  the claim that the defendant deviated from an acceptable professional standard is based solely
        on allegations that other licensed professionals for whom this defendant is responsible deviated
        from an acceptable professional standard, or . . .

        (3)  expert testimony of an appropriate licensed professional is unnecessary for prosecution of the
        claim.
231 Pa. Code Rule 1042.3(a).

that applies to professional malpractice claims based on Pennsylvania law that are asserted in federal court. *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262-64 (3d Cir. 2011) (citing *Erie R.R. v. Thompkins*, 304 U.S. 64 (1983)). Thus, for purposes of a motion to dismiss or motion for summary judgment, Rule 1042.3 is applied as "controlling, substantive state law." *Scaramuzza v. Sciolla*, 345 F. Supp. 2d 508, 509-10 (E.D. Pa. 2004). "[A] plaintiff's failure to comply with Rule 1042.3 requires dismissal of any malpractice claim." *Bennett v. PrimeCare Medical*, Inc., 2018 WL 6072126, at *10 (M.D. Pa. Sept. 14, 2018). While the Court recognizes the difficulties inmates face in obtaining a COM, they are not excused from the requirements of Rule 1042.3.

Trainor filed Certificates of Merit pursuant to Pa. R. Civ. P. 1042(a)(3) certifying that "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claims asserted against" each Defendant. ECF No. 5. A narrow exception to the expert testimony requirement exists where a case of medical or other professional malpractice is "so simple and the lack of skill or want of care is so obvious as to be within the range of ordinary experience or comprehension of even non-professional persons" and, thus, the case does not require expert testimony. *Gindraw v. Dendler*, 967 F. Supp. 833, 837 (E.D. Pa. 1997) (quoting *Hoffman v. Mogil*, 445 Pa. Super. 252, 256–57 (1995) (quoting *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794 (1970))). *See also Hunter v. Robison*, 488 S.W.2d 555, 560 (Tex. Civ. App. 1972) (the exception applies to cases where "the negligence 'is obvious to the untrained layman, [such as leaving surgical instruments or sponges in the incision or operating on the wrong portion of the body[.]]'"). But this is not such a case.

Trainor asserts that "Defendants failed to exercise ordinary knowledge, skill and care in response to [his] constant pleas for medical attention." ECF No. 1, ¶ 111. Trainor's medical

malpractice/negligence claim requires expert testimony to identify the standard of care for each medical professional, a deviation from that standard as to each Defendant, and causation of injury or other damages. *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 255 (2003) (citing *Hightower-Warren v. Silk*, 548 Pa. 459, 698 A.2d 52 (1997)) ("Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury."). Yet, as Defendants correctly argue, "because Mr. Trainor indicated in his Certificates of Merit that expert testimonies of appropriate licensed professionals are unnecessary for the prosecution of this claim, he is now bound by his certifications and precluded from introducing any expert testimony at trial," absent exceptional circumstances. ECF No. 57, p. 27. *See also* Pa. R. Civ. P. 1042.3(a)(3), Note; *Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) ("Pennsylvania law expressly allows a plaintiff to proceed on the basis of a certification that expert testimony will not be required to prove her claim. . . the consequence of such a filing is a prohibition against offering expert testimony later in the litigation, absent 'exceptional circumstances.'"). Trainor has failed to identify expert support for essential elements of his medical malpractice claim and is now precluded from doing so. The Medical Defendants have properly identified essential elements of Trainor's claim concerning which no support exists in the record. Accordingly, the Medical Defendants are entitled to judgment in their favor on Trainor's medical malpractice claim.

**V.    Conclusion**

For the foregoing reasons, the Medical Defendants' motion for summary judgment (ECF No. 56) and DOC Defendants' motion for summary judgement (ECF No. 68) will be GRANTED.  A separate order will follow.


DATED this 22nd day of March, 2023.

BY THE COURT:


RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE
